124

1   direct in 15 minutes?

2                    MR. ROSENBAUM:        Yes.

3                    THE COURT:            Okay, bring him in.

4                    MR. DUFF:             Who is it?

5                    THE COURT:            I don't know who it

6   is.

7                    MR. DUFF:             Cross will be longer,

8   Your Honor.

9                    THE COURT:            I know.  We won't do

10  the cross.

11                       (Thereupon, the following took place

12                       within the hearing of the jury.)

13                    THE COURT:            Next witness, please,

14  Mr. Rosenbaum.

15                    SANDRA WILLIAMS

16  a Witness herein, called on behalf of the State of Ohio,

17  after first being duly sworn by the Court, testified

18  and said as follows:

19                    DIRECT EXAMINATION OF SANDRA WILLIAMS

20  BY MR. ROSENBAUM:

21  Q.    State your name, please.

22  A.    Sandra Williams.

23  Q.    Are you employed, ma'am?

24  A.    Yes, sir.

25  Q.    Can you tell the Court and jury what you do for a

CATHLENE M. ACIERTO, RPR - (216) 965-4498

**EXHIBIT**

21

125

1      living?

2      A.    I work at Parker Hannafin.

3      Q.    What do you do there?

4      A.    I'm a lead assembler.

5      Q.    How long have you worked there, ma'am?

6      A.    Twenty-two years.

7      Q.    Do you know a person by the name of Ronald Lally?

8      A.    Yes, sir.

9      Q.    How did you know him, ma'am?

10     A.    I was engaged to him.

11     Q.    Can you identify the person whose face is depicted in

12     State's Exhibit 2-B?

13     A.    Yes.

14     Q.    Who is that?

15     A.    Ron Lally.

16     Q.    How long did you know him for?

17     A.    Thirteen years.

18     Q.    Were you still dating him at the time of his death?

19     A.    Yes, sir.

20     Q.    Did you live together at times?

21     A.    Yes, sir.

22     Q.    Did you always live together?

23     A.    Yeah, basically.

24     Q.    Did he have a place his own, though?

25     A.    At the time of his death, yes.


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

126

1    Q.    Did you break up with him anywhere in those 13 years?

2    A.    Yeah, about the last year of his life.

3    Q.    And did you break up at other times during the

4    relationship?

5    A.    Once for about three months.

6    Q.    What caused the problems in your relationship?

7    A.    Drugs.

8    Q.    What do you mean by that?

9    A.    He was smoking crack and I didn't like it.

10   Q.    He was an addict?

11   A.    Yes.

12   Q.    When did he become an addict, if you know?

13   A.    About four years --

14   Q.    Did he --

15   A.    -- before he died.

16   Q.    Did he do things as a result of that, that would

17   upset you?

18   A.    Yeah.

19   Q.    What were -- what was that?

20   A.    He stole things from me.

21   Q.    Like what?

22   A.    Money, jewelry, VCR, microwave.

23   Q.    Did he admit doing this to you after he would do it?

24   A.    Yeah.

25   Q.    And how did he feel about it?

CATHLENE M. ACIERTO, RPR - (216) 965-4498

127

1  A.   He always he said felt bad about it.

2  Q.   But could he stop, or did he stop?

3  A.   No.

4  Q.   Did he steal anything from you in June of 1993?

5  A.   Yeah, my microwave.

6  Q.   Did he admit that to you?

7  A.   No, not right away.

8  Q.   Where was his place that he had separate from yours

9  at the time that he died?

10  A.   On Middle Avenue, an apartment across from the high

11  school.

12  Q.   Is that by Mr. Hero?

13  A.   Yes.

14  Q.   Is it next to Mr. Hero?

15  A.   Yes, right across the alley.

16  Q.   Now, have you ever seen the person who's seated below

17  my right hand?

18  A.   Yes, sir.

19  Q.   Do you know his name?

20  A.   Danny Smith.

21  Q.   When did you learn his name?

22  A.   When he came into my yard.

23  Q.   When was that?

24  A.   In September of '93.

25  Q.   Do you know if it was on the 7th?

CATHLENE M. ACIERTO, RPR - (216) 965-4498

128

1          MR. DUFF:              Object.

2    A.    I can't recall.

3    Q.    What happened when he came to your yard?

4    A.    He was making threats against Ron.

5    Q.    Tell the Court and jury exactly what the defendant

6    said to you, as best you can recall it.

7    A.    He said that I should tell Ron that they knew where

8    he was at and they knew where his family lived and it

9    would be a shame if his family got hurt.

10   Q.    Did he say, or did he indicate knowledge of what type

11   of structure, Ron Lally's structure lived in?

12   A.    Yes.

13   Q.    What did he say?

14   A.    He knew that he lived in a mobile home.

15   Q.    And did he say what faith might befall this mobile

16   home?

17   A.    It might be blown up.

18          MR. ROSENBAUM:       I have no other

19   questions, Your Honor.

20            CROSS-EXAMINATION OF SANDRA WILLIAMS

21   BY MR. DUFF:

22   Q.    Did you give a statement to any police officers in

23   regard to this case?

24   A.    When he came to the house.

25   Q.    When who --

        CATHLENE M. ACIERTO, RPR - (216) 965-4498

129

1   A.    Danny.

2   Q.    No, no.  Did you ever make a statement to the, a

3   police officer, Detective Leiby or any other

4   individual?

5   A.    Yes.

6   Q.    Did you write it out?

7   A.    I didn't write it, no.

8   Q.    Did you give a taped statement?

9   A.    Yes, they did tape it.

10  Q.    All right.

11              MR. DUFF:          We'd ask for that,

12  Your Honor.

13              THE COURT:         Very well.

14              MR. DUFF:          Let me finish.  Can I

15  finish?

16      How many statements did you give that were taped?

17  A.    Just one, I believe.

18  Q.    All right.  Do you want to take time to think about

19  that?  Are you sure?

20  A.    As best as I can remember, yeah, it was only once.

21  Q.    Do you know the date that you gave this taped

22  statement?

23  A.    No, I can't remember.

24  Q.    Did you ever write anything down in regard to this

25  case?

CATHLENE M. ACIERTO, RPR - (216) 965-4498

130

1   A.    I can't remember.

2   Q.    You don't know if you ever wrote anything down?

3   A.    I don't remember, no.

4   Q.    All right.

5               MR. DUFF:          We'd ask for the

6   statement.

7               THE COURT:          Okay.  Ladies and

8   gentlemen, something that has to be done.  I get the

9   statement at this point.  I get the taped statement at this

10  point.   It's an in-camera inspection, correct?  And

11  ladies and gentlemen, we've reached a point where I have to

12  examine certain things and that has to be done

13  certainly outside of your hearing and your viewing at

14  this point.

15       While the clock on the wall says five minutes to

16  12:00, it's probably a good time to take our noon recess at

17  this point.  I'm looking for myself at this point.  I'll

18  take a while to listen.  Let's come back, let's come back

19  at 1:15, so that we can get started as close to that time

20  as possible.

21       The admonitions that I've given in the past about

22  discussing this matter amongst yourselves, letting anyone

23  discuss it with you, letting anybody read anything to you

24  you, reading anything to yourself about that, please do not

25  do so.  And with that, we will take our noon recess.


            CATHLENE M. ACIERTO, RPR - (216) 965-4498

131

1          (The noon recess was had.)

2          (The Court had an in-camera inspection of

3          the taped statement of Sandra Williams and

4          made the finding there no inconsistencies

5          on the record.)

6          (The following took place within the

7          presence and hearing of the jury.)

8          THE COURT:          Good afternoon,

9    ladies and gentlemen.  Ladies and gentlemen, as you recall,

10   we had finished the direct examination of this witness,

11   started the cross-examination of this witness, and as a

12   result of certain housework that this court had to do out

13   of your hearing, we adjourned at that point.

14       But glad to report to you this housework has been

15   completed and the results of said housework has been

16   entered into the record, and we are now ready to proceed

17   further with the cross-examination of this witness.

18       Mr. Duff.

19          MR. DUFF:          Yes, Your Honor.

20   BY MR. DUFF:

21   Q.   Miss Williams, is that it?

22   A.   Yes.

23   Q.   Miss Williams, I'd like to ask you a few questions if

24   I may; is that all right?

25   A.   Yes.


CATHLENE M. ACIERTO, RPR - (216) 965-4498

132

1   Q.    Okay.  As I understand it, you're not able, on your

2   direct examination, you were not able to recall the date

3   that this alleged incident occurred?

4   A.    Which incident?

5   Q.    The incident where you claim Danny Smith came over to

6   your house, you don't recall the date?

7   A.    I don't recall the date.

8   Q.    If I were to suggest to you a date of 9-7-93, would

9   that be consistent with what you recall?

10  A.    Probably, yes.

11  Q.    Okay.  You wouldn't quibble with that?

12  A.    No.

13  Q.    All right.  Now, as I understand it, you spoke to

14  Detective Leiby other than coming to court, you testified

15  in the previous cases; is that right?

16  A.    Yes, sir.

17  Q.    Both cases.  Did you testify in the Raymond Smith

18  case?

19  A.    Yes, sir.

20  Q.    Stanley Jaloweic case?

21  A.    Yes, sir.

22  Q.    All right.  Now, other than those cases, in talking

23  to Detective Leiby under those conditions you spoke to

24  Detective Leiby, you gave him a taped statement, correct?

25  A.    Yes.


CATHLENE M. ACIERTO, RPR - (216) 965-4498

133

1    Q.    All right.  And that was done January 3rd of 1995; is

2    that correct?

3    A.    Somewhere around in there, yeah.

4    Q.    Would you argue with that?

5    A.    No.

6    Q.    All right.  Now, where had you given that statement

7    at?

8    A.    The police station.

9    Q.    All right.  You met with and saw him down there?

10   A.    Yes.

11   Q.    And you had spoken to him one other time before that;

12   is that correct?

13   A.    Yes.

14   Q.    He had called your house looking for Ron.  Detective

15   Leiby had called your house looking for Ron back in

16   September of '93; do you recall that?

17   A.    No.

18   Q.    You don't recall the date of 9-20-93 when Detective

19   Leiby called your house looking for Ron?

20   A.    No, sir.

21   Q.    All right.  How about the date, you don't recall the

22   date or you don't recall the phone conversation at all?

23   A.    I don't recall the phone conversation at all.

24   Q.    Well, if you were to tell you that you discussed

25   that --

CATHLENE M. ACIERTO, RPR - (216) 965-4498

134

| | | |
|---|---|---|
| 1 | MR. ROSENBAUM: | Objection. |
| 2 | MR. DUFF: | Can I finish? |
| 3 | THE COURT: | Let's hear the |

4 question.

5 Q.    If I were to tell that you discussed that phone call

6 with Detective Leiby on the tape --

7                    MR. ROSENBAUM:        Objection.

8                    MR. DUFF:        I'm not trying to

9 impeach, I'm trying to refresh her recollection, Your

10 Honor.

11                    THE COURT:        Again, at this point

12 you're using that --

13                    MR. DUFF:        To refresh her

14 recollection.

15                    THE COURT:        Well, not necessarily

16 to refresh.  Can you think very hard about that as to

17 whether or not there was any other kind of conversation?

18                    THE WITNESS:        No, I can't remember.

19                    MR. DUFF:        Can I play the tape

20 to refresh her --

21                    MR. ROSENBAUM:        Objection.  He

22 shouldn't be mentioning that tape in front of the jury.

23 It's a limited use that he gets to hear it for and he's

24 exceeded it.

25                    MR. DUFF:        Outside the presence

CATHLENE M. ACIERTO, RPR - (216) 965-4498

135

1    of the jury.  Can that be accomplished, Your Honor, to

2    refresh her recollection, listening to a tape to refresh

3    her recollection of conversation.

4                    THE WITNESS:        I don't know.

5                    THE COURT:          Ladies and gentlemen,

6    I'm going to return you to your jury room at this point.

7    Again, an item has come up at this point that has to be

8    done outside of your hearing.  Admonitions that I've given

9    in the past about discussing these matters or letting

10   anyone discuss them with you, reading about this case,

11   letting anybody read to you, still hold.  With that we will

12   take hopefully what amounts to a very short recess.

13                        (Discussion was had without the

14                        presence and hearing of the jury as to

15                        whether the tape would be played to

16                        refresh the witness' recollection.  The

17                        judge listened to the tape again and ruled

18                        it was not necessary to play the tape.)

19                        (The following took place within the

20                        presence and hearing of the jury.)

21                    THE COURT:          Mr. Duff, continue

22   your questioning.

23                    MR. DUFF:           Thank you, Your

24   Honor.

25   BY MR. DUFF:


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

136

1   Q.    Now, there's been some conversation between you and

2   me as far as a phone call on September 20th, 1993; is that

3   correct?

4   A.    Yes, sir.

5   Q.    Do you recall any time prior to 1-3-95, this date

6   over here, when you gave the taped statement at the police

7   station, do you recall ever telling anyone, including

8   Detective Leiby, the gentleman under my hand here, about

9   this alleged incident with Danny Smith?

10  A.    I talked to Detective Leiby just shortly after Danny

11  had left my yard.

12  Q.    All right.  On 9-7-93?

13  A.    Yes, sir.

14  Q.    Did you make a police report on that?

15  A.    No, sir.

16  Q.    You didn't make a police report, you didn't file a

17  complaint?

18  A.    No, sir.

19  Q.    Where did you talk to Detective Leiby at allegedly?

20  A.    I called him.

21  Q.    You called him.  Do you know the date of that call?

22  A.    9- 7-93.

23  Q.    Did you call the police on 9-7-93?

24  A.    Yes.

25  Q.    All right.  Now, well, if there would be evidence


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

137

1   forthcoming in this case that you talked to Detective Leiby

2   on September 20th, 1993, would there be such evidence

3   forthcoming in this case, you don't recall?  Did you

4   mention to him on September 20th anything about there

5   incident 1993?

6   A.    I don't remember talking to him on that date.

7   Q.    Well, I asked you to assume there's evidence

8   forthcoming.

9                   MR. ROSENBAUM:       Objection.

10                  MR. DUFF:            It's got a good faith

11  basis, Your Honor.

12                  THE COURT:           She says she doesn't

13  recall having talked to him on that date.  How can she

14  assume anything at this point?

15                  MR. DUFF:            Can I reframe?

16                  THE COURT:           Frame it.

17  Q.    Assume Detective Leiby were to testify in this case

18  that he spoke to you September 20th, 1993, all right.  Do

19  you know if you mentioned to him this alleged incident

20  with Danny Smith on that date?

21                  MR. ROSENBAUM:       Objection.

22                  THE COURT:           She says she doesn't

23  recall that conversation.

24                  MR. DUFF:            All right.

25                  THE COURT:           Sustained.


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

138

1               MR. DUFF:            Thank you, Your

2   Honor.

3        Now, Danny -- Ron was, you've been dating him since

4   when?  What year did you start dating him?

5   A.   1981.

6   Q.   1981.  And I think your testimony in the previous

7   cases was that for the last four years of your relationship

8   he was a crack addict, right?

9   A.   Yes, sir.

10  Q.   He was also hooked on pills and Valium; is that

11  correct?

12  A.   Yes, sir.

13  Q.   All right.  So, if he died in January of '94, that

14  means he would have been addicted to crack, in your view,

15  going back to, what, 1990, January of '90?

16  A.   Yeah.

17  Q.   And he had no problem before that?

18  A.   No, sir.

19  Q.   Okay.  So your testimony is that before 1990, Ronald

20  had no drug problem?

21  A.   I can't say he didn't have.  He did drugs, but it

22  wasn't a problem.

23  Q.   It wasn't, he wasn't addicted to crack cocaine?

24  A.   Right.

25  Q.   Okay.  Would it surprise you to tell you -- do you

               CATHLENE M. ACIERTO, RPR - (216) 965-4498

139

1    know Detective Homoki?

2    A.    Yes, sir.

3    Q.    Would it surprise you to tell you that he said Ron

4    was a crack addict as far back as 1988, would that surprise

5    you of that testimony?

6    A.    No.

7    Q.    All right.  Now, you know Danny's black, right?

8    A.    Yes.

9    Q.    All right.  Is it true you told Detective Leiby you

10   couldn't recognize Danny?

11   A.    No, sir, I didn't say that.

12   Q.    You never said you couldn't recognize him?

13   A.    I don't believe I ever said that, no.

14   Q.    You never told Detective Leiby that you would not

15   recognize Danny?

16   A.    I don't remember ever saying that, no.

17   Q.    Okay.  All right.  Now, you loved Ron Lally, right?

18   A.    Very much.

19   Q.    More than anybody else in the world?

20   A.    Short of my grandchildren.

21   Q.    Next to your grandchildren?

22   A.    Short of my grandchildren.

23   Q.    You were with him 13 years, right?

24   A.    Yes, sir.

25   Q.    You upset with Danny because you think he might have

CATHLENE M. ACIERTO, RPR - (216) 965-4498

140

1   had a role in this killing?

2   A.    No, not particularly.

3   Q.    Doesn't bother you?

4   A.    Well, yes, it bothers me, but why, I can't be upset

5   with him.  It wouldn't bring Ron back.

6   Q.    How about the fact that Danny's black, does that

7   bother you?

8   A.    No, sir.

9   Q.    Did you ever go to a KKK meeting?

10  A.    No, sir.

11  Q.    You never went to a KKK meeting?

12  A.    No, sir.

13  Q.    You never told Detective Leiby you went to a KKK

14  meeting in Lodi, Ohio?

15  A.    That is not what I told Detective Leiby.

16  Q.    Just answer my question.  Did you ever tell Detective

17  Leiby that you and Ron Lally went to a KKK meeting in Lodi,

18  Ohio, did you ever tell him that, yes or no?

19  A.    No.

20  Q.    Did you ever go to a KKK meeting?

21  A.    Meeting, no.

22  Q.    Did you ever go to a KKK, KKK event, yes or no?

23  A.    No.

24  Q.    Event?

25  A.    No.


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

141

1    Q.    Did you ever go to any kind of KKK --

2                   MR. ROSENBAUM:      Your Honor, is there

3    some relevance to this?

4                   MR. DUFF:          A lot.

5                   MR. ROSENBAUM:      Maybe we can approach

6    the bench and hear.

7                   THE COURT:          Can you tie it in?

8                   MR. DUFF:           I can tie it in.

9                   MR. ROSENBAUM:      I would like to hear

10   the relevance at the bench, if it please the Court.

11                  THE COURT:          Come on.

12                  (Conference at the bench between the Court

13                  and counsel, as follows:)

14                  THE COURT:          He's

15   cross-examining.

16                  MR. DUFF:           All right, I'll do

17   it.

18                  THE COURT:          I don't go for the

19   double-barrel anymore.

20                  MR. DUFF:           I can handle it.  The

21   relevancy is she has feelings against blacks and Danny is

22   black.

23                  THE COURT:          I don't think he

24   has --

25                  MR. DUFF:           That's what I'm

CATHLENE M. ACIERTO, RPR - (216) 965-4498

142

1    trying to bring out.

2                    MR. ROSENBAUM:        She's answered that

3    question.  She said she doesn't.

4                    MR. DUFF:             I'm trying to explore

5    that.

6                    MR. ROSENBAUM:        You are not.

7                    THE COURT:            You better word what

8    he went to, exactly what he went to.

9                    MR. ROSENBAUM:        She said she doesn't

10   have feelings against blacks.  She doesn't have particular

11   bad feelings about Danny, and she hasn't attended a rally.

12                   THE COURT:            He didn't ask if she

13   had gone to a rally, it was whether she went to a meeting.

14                   MR. ROSENBAUM:        She didn't go to the

15   rally either.  She said she did not go to the event.  Yes,

16   she did.  You're trying to twist what happened.  That's not

17   what she said.  She knew that they stage a thing.  She went

18   to watch.  She wasn't attending that rally.  It's like

19   going to a fire.  It doesn't mean you set it.

20                   THE COURT:            All right.

21                   MR. DUFF:             That's redirect, Your

22   Honor.

23                   MR. ROSENBAUM:        No, it's not.

24                   THE COURT:            Proceed, please.

25                   MR. ROSENBAUM:        He's trying to create

CATHLENE M. ACIERTO, RPR - (216) 965-4498

143

1  a wrongful impression.

2  BY MR. DUFF:

3  Q.    Let me ask you this, Ms. Williams.  Did you ever go

4  to a KKK meeting to just watch and not participate?

5  A.    Yes, sir.

6  Q.    Thank you.  How many times did you go to KKK

7  meetings?

8  A.    Just the one time.  It wasn't a meeting.

9  Q.    Thank you.  Whatever it was.  And that was in Lodi,

10  Ohio?

11  A.    Yes, sir.

12  Q.    Who did you go there with?

13  A.    Ron and a couple other friends.

14  Q.    All right.  And you're not a member of KKK?

15  A.    No, sir.

16  Q.    You think that's funny?

17  A.    Well --

18              MR. ROSENBAUM:      I do.  I think it's

19  ludicrous.

20              MR. DUFF:           Object.

21              MR. ROSENBAUM:      What you do --

22              THE COURT:          All right.

23              MR. ROSENBAUM:      I object to this.

24              THE COURT:          All right.  At this

25  point get your questions out, Mr. Duff, whether she thinks

              CATHLENE M. ACIERTO, RPR - (216) 965-4498

St. Witness, Sandra Williams:
  Admitting to Perjury in Jalowsic Trial by Answers
  given in Testimony at Dan Smith Trial.

Exhibit BB

144

1   it's funny or not.

2   BY MR. DUFF:

3   Q.    Now, let's talk about this alleged incident in

4   September of the '93, the 7th.  You claimed there are a lot

5   of people present during this thing, correct?

6   A.    Yes.

7   Q.    During this alleged threat; is that right?

8   A.    There were four people.

9   Q.    Four.  Mike Tolvert was there, right?

10  A.    Yes, sir.

11  Q.    William Pierce was there, right?

12  A.    Yes, sir.

13  Q.    Duane Moore was there?

14  A.    No, sir.

15  Q.    Linda Dennis was there?

16  A.    Yes, sir.

17  Q.    And this was in broad daylight, right?

18  A.    Yes, sir.

19  Q.    And he didn't directly threaten you, did he, Danny,

20  according to you?

21  A.    No, he did not.

22  Q.    He told you he was mad and upset with Ron over this

23  thing, right?

24  A.    Yes.

25  Q.    Is William Pierce your son-in-law?

              CATHLENE M. ACIERTO, RPR - (216) 965-4498

145

```
 1    A.    Yes.

 2    Q.    Who is Duane Moore?

 3    A.    A friend of Rons.

 4    Q.    Okay.  Linda Dennis is who?

 5    A.    My friend.

 6    Q.    How about William Pierce, he's your future son-in-law

 7    or is your son-in-law?

 8    A.    At the time he was my future son-in-law.  Now --

 9    Q.    Who is he?

10    A.    Now he's married to my daughter.

11    Q.    What's her name?

12    A.    Audra.

13    Q.    Audra?

14    A.    Yes.

15    Q.    Was she present?

16    A.    No.

17    Q.    Who is Ralph Zinner?

18    A.    It was a friend of Rons.

19    Q.    Did you tell Detective Leiby --

20              MR. ROSENBAUM:      Can we approach the

21    bench?

22              THE COURT:      Yes.

23              (Conference at the bench between the Court

24              and counsel, as follows:)

25              MR. ROSENBAUM:      This is clearly,
```

CATHLENE M. ACIERTO, RPR - (216) 965-4498

E-2

146

```
1    again, an improper use of that tape.
2                 MR. DUFF:          I haven't asked the
3    question.
4                 MR. ROSENBAUM:     Which has happened
5    with the KKK is also improper use of that tape.  He would
6    not have that.  There was no inconsistent statement.  He is
7    improperly using it.  It should be stricken.  Now he wants
8    to go into the tape about what did you tell Detective
9    Leiby.
10                MR. DUFF:          Judge, there is no
11   rule of law that says if I hear relevant information on
12   in-camera examination -- let me finish.
13                MR. ROSENBAUM:     Why in camera?
14                THE COURT:         Why is it in camera?
15   For one purpose.
16                MR. DUFF:          You determine
17   inconsistencies.  If there other pertinent, relevant things
18   it is subject to cross.  I'm --
19                MR. ROSENBAUM:     You show me a case
20   and you'll never hear me say anything.
21                MR. DUFF:          I'm exploring on
22   cross.
23                MR. ROSENBAUM:     You don't know about
24   it until you have it.
25                MR. DUFF:          What am I supposed to
```

CATHLENE M. ACIERTO, RPR - (216) 965-4498

147

1    do, erase it from my mind?

2                    MR. ROSENBAUM:        That's why the rule

3    was drafted.  You don't even get to see it.  In some court

4    of appeals, you don't get to hear it.  He determines it.

5                    MR. DUFF:        Not this one.

6                    MR. ROSENBAUM:        You're violating the

7    rule and I think the Court's --

8                    MR. DUFF:        No, I'm not.

9                    MR. ROSENBAUM:        The remarks about the

10   KKK should be stricken.

11                   MR. DUFF:        No.  Judge, before

12   you allowed us to go, I thought as other things --

13                   THE COURT:        I thought there was

14   more material in the tape.

15                   MR. DUFF:        You said other things

16   I might be able to explore.

17                   THE COURT:        Go ahead.  All right.

18   At this point continue.

19                   (The following took place within the

20   hearing of the jury.)

21                   MR. DUFF:        Nothing else, Your

22   Honor.

23                   THE COURT:        Mr. Rosenbaum, any

24   redirect?

25                   MR. ROSENBAUM:        I made a motion to


                CATHLENE M. ACIERTO, RPR - (216) 965-4498

148

1   strike some testimony about the KKK.

2                   MR. DUFF:           Object to that, Your

3   Honor.

4                   THE COURT:          I will deny that at

5   this point.

6               REDIRECT EXAMINATION OF SANDRA WILLIAMS

7   BY MR. ROSENBAUM:

8   Q.   Have you ever subscribed to the ideals of the KKK?

9   A.   No, sir.

10  Q.   Do you believe in them?

11  A.   No, sir.

12  Q.   Do you detest them?

13                  MR. DUFF:           Object.

14  A.   Yes.

15                  THE COURT:          Overruled.

16  Q.   Did you go to this meeting in Lodi just to witness

17  the spectacle that may happen with the Klan and the police?

18  A.   Yes, sir.

19  Q.   Did the Klan ever show up?

20  A.   No, sir.

21                  MR. ROSENBAUM:      I have no other

22  questions.

23                  THE COURT:          Mr. Duff.

24              RECROSS-EXAMINATION OF SANDRA WILLIAMS

25  BY MR. DUFF:


            CATHLENE M. ACIERTO, RPR - (216) 965-4498